**<u>AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS</u>**

I, Task Force Officer Clifford Ellston, being first duly sworn, state under oath as follows:

<u>Preface</u>

1.      The following affidavit is furnished to support a search warrant for the following: (1) the residence located at 278 Success Road, Milan, New Hampshire ("Success Road Residence"). A detailed property description is contained in Attachment A. Based on the facts and circumstances contained in this affidavit, I submit that there is probable cause to believe that Jake Arsenault, and others known and unknown, are engaged in narcotics trafficking activities that constitute violations of 21 U.S.C. § 846 (conspiracy to distribute controlled substances) and 21 U.S.C. § 841(a)(1) (distribution of controlled substances and possession with intent to distribute controlled substances).

2.      A federal Grand Jury in the District of New Hampshire has returned an Indictment charging Jake Arsenault with two counts of distribution of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1).  This affidavit will present an overview of the controlled buys charged in the indictment and facts giving rise to probable cause to support the issuance of search warrant for the Success Road Residence which, investigators believe, will yield evidence of criminal activity, contraband, and fruits and instrumentalities of these crimes.

<u>Introduction</u>

3.      I am an investigative or law enforcement officer of the United States, within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.

1

4.      I am currently a Drug Enforcement Administration ("DEA") Task Force Officer ("TFO") with the Southern New Hampshire DEA High Intensity Drug Trafficking Area Task Force in the Manchester District Office ("MDO") and have been so assigned since January 2019. As a DEA TFO, my duties and responsibilities include the investigation of federal crimes, including violations of 21 U.S.C. §§ 841(a)(1) and 846.

5.      I have been employed as a Police Officer with the Manchester, New Hampshire Police Department ("MPD") since July 2008. I have been assigned to the MPD Special Enforcement Division in the Special Investigations Unit ("SIU"), which among other crimes primarily investigates violations of the Controlled Drug Act, NH RSA 318-B:2. I have been assigned to SIU since August 2015.

6.      I graduated the New Hampshire Police Standards and Training Council Police Academy in November 2008. I have attended multiple drug related investigation courses. These classes include, but are not limited to the DEA Basic Narcotic School, Federal Bureau of Investigations Safe Streets School, New Hampshire State Police ("NHSP") Basic Drug Investigation School, Identifying the Imposters, Law Enforcement Narcan Administration, Mexican Drug Cartels, Motor Vehicle Hide, Physical Surveillance, Social Networking and TacticID Certification Training.

7.      I have investigated numerous crimes involving the sale, possession, and possession with the intent to sell various controlled drugs. I have assisted in drug investigations involving various federal, local and state law enforcement agencies. The investigations targeted street level dealers to major suppliers of illegal drugs. I have participated in many cases that have resulted in arrests, search warrants, and successful prosecutions at the state and federal levels.

8.      I have worked in a plain clothes capacity and have personally observed the distribution, sale and possession of various controlled substances including, but not limited to cannabis, cocaine, cocaine based substances, fentanyl, heroin, hashish, crystal methamphetamine, and various illegally manufactured and/or obtained pharmaceutical drugs.

9.      Based upon my training and experience, I am familiar with drug traffickers' methods of operation, including the distribution, storage, and transportation of drugs and the collection of money that constitutes the proceeds of drug trafficking activities.  I am familiar with the types of packaging used to distribute controlled substances as well as equipment used such as scales, bags, pill presses and cutting agents. I am also familiar with drug-related paraphernalia and the equipment used to ingest controlled substances, such as syringes and smoking pipes.  I have talked to drug dealers and listened to their conversations, so I am familiar with the coded language often used in these conversations.  Because of my training and experience, I am familiar with new trends of concealing illegal drug trafficking. I also stay current on the latest technology used to investigate drug crimes. In sum, through my training, education, and experience, I have become familiar generally with the manner in which drug traffickers conduct their illegal activities, including purchasing, manufacturing, storing, and distributing drugs, the laundering of illegal proceeds, and the efforts of persons involved in such activity to avoid detection by law enforcement.  Observations made and conclusions drawn throughout this affidavit that are based on my training and experience also include the training and experience of other law enforcement agents and officers with whom I have discussed these issues.

10.      I am familiar with the facts and circumstances of this investigation from my own personal participation and from oral and written reports given to me by Special Agents, Task

Force Officers, and members of law enforcement. Since this affidavit is being submitted for the limited purpose of establishing that probable cause exists to support the issuance of a search warrant, I have not included details about every aspect of the investigation. While this affidavit contains all the material information I am aware of that is pertinent to the requested search warrants, it does not set forth all of my knowledge about this matter.

11.     Based upon information obtained from a variety of sources, including confidential sources, physical surveillance, and the controlled purchases of drugs, I believe that Arsenault and others are actively involved in the distribution of methamphetamine in New Hampshire.

<u>Confidential Human Source #1</u>

12.     CS1 began cooperating with the DEA in 2019 and has cooperated in exchange for consideration on forthcoming charges related to a traffic stop where CS1 was found to be in possession of methamphetamine, pills, and a firearm.  Information CS1 has provided has proven to be reliable.  For example, law enforcement has corroborated CS1's information regarding sources of supply, and CS1 has participated in controlled drug buy operations, and has provided information and participated in operations resulting in the seizure of assets and drugs.

13.     CS1 has convictions for a Misdemeanor B violation of the Controlled Drug Act, from the Berlin, New Hampshire District Court in 2015 and a Misdemeanor B Reckless Conduct violation from the Berlin, New Hampshire District Court in 2015.

14.     CS1 provided the following information during an interview in October of 2019:[1] CS1 uses and distributes methamphetamine.  CS1 said it has one customer named Jake Arsenault

---

[1] A few days after CS1's interview, Augusta, Maine Police relayed information that individuals from Maine were reportedly going to an unknown location in New Hampshire to buy an unknown quantity of methamphetamine from an unknown source of supply in the near future.  The phone number provided for the reported supplier for this transaction was identified as the CS1's phone number.  Surveillance was established on CS1 shortly after this information was reported to investigators, and no criminal activity was observed.

who lives on Success Loop in Milan, New Hampshire.  CS1 reported that it sells quarter pounds

of methamphetamine to Arsenault for $3,000.  According to CS1, CS1 served as intermediary

and would take Arsenault's money to CS1's methamphetamine source of supply, and purchase

methamphetamine for Arsenault.

15.     In my training and experience, a quarter pound of methamphetamine is a quantity

that is indicative of distribution, rather than for personal use.  So, it is likely that Arsenault was

re-selling at least some of the methamphetamine he was obtaining from CS1.

16.     Because CS1 is no longer serving as an intermediary between Arsenault and

CS1's methamphetamine source of supply, and because (as described below) Arsenault

continues to engage in the distribution of methamphetamine, I believe Arsenault has a new

source of supply for methamphetamine.

<u>January 19, 2021 Controlled Buy</u>

17.     On January 19, 2021, at the direction of DEA, CS1 conducted a controlled

purchase of methamphetamine from Arsenault at the Success Road Residence.  CS1 arranged to

purchase an "eight ball" of methamphetamine from Arsenault using the Telegram messenger

application[2] by text between January 16, 2021 and January 18, 2021.  I reviewed these messages

and confirmed they arranged the purchase of methamphetamine. Based on my training and

experience, I know an "eight ball" to be a common term to describe 3.5 grams of drugs.

18.     CS1 and its vehicle were searched before the controlled transaction. CS1 was then

provided $250.00 in recorded currency.  CS1 was also outfitted with audio and video recording

equipment.  Shortly before 2 pm on January 19, 2021, CS1 arrived at the Success Road

---

[2] Telegram is a messaging application, which provides end-to-end encrypted voice and video calls.

Residence.  I observed CS1 drive into the driveway at the Success Road Residence and I could

hear CS1 speak to a male, who CS1 subsequently identified as Arsenault, shortly upon arrival.[3]

19.     Approximately 14 minutes after arriving at the Success Road Residence, I

observed CS1 driving away from the Success Road Residence.  Law enforcement followed CS1

to a predetermined location where CS1 provided law enforcement with a small zip loc bag.  The

bag was clear on one side and had black and yellow Batman symbols on the other side. The bag

contained a clear crystal substance.  With packaging, the weight of the purchased evidence was

32.8 grams.  I tested the contents of the bag with a TacticID Roman Spectrometer, and the

contents of the bag provided a presumptive positive result for the presence of methamphetamine.

The methamphetamine was sent to the Northeast Regional Laboratory for testing. The substances

identified in the exhibit were identified as methamphetamine hydrochloride, had a net weight of

3.567 grams, and a substance purity level of 93%.

20.     Just as before, CS1 and its vehicle were searched; law enforcement ensured that

there was no concealed cash, drugs, drug paraphernalia, or weapons in CS1's person or in the

vehicle.

21.     CS1 provided the following information about the January 19, 2021 controlled

transaction: CS1 drove to the Success Road Residence and saw Arsenault snow blowing outside

the Success Road Residence.  Arsenault led CS1 to an exterior cellar door and escorted CS1 to

the basement of the Success Road Residence.  Arsenault produced a clear plastic jar containing

suspected methamphetamine and poured methamphetamine into a small baggie.  Arsenault then

---

[3] The audio and video devices stopped transmitting shortly after CS1's arrival at the Success Road Residence, thus the remainder of the transaction was not audio or video recorded.  Following the controlled purchase, I reviewed the recordings.  It appears that there was a malfunction with the recording and only 28 minutes and 39 seconds of the operation (including travel to the Success Road Residence) were recorded.

weighed the bag and its contents.  Arsenault handed CS1 the suspected drugs and CS1 handed Arsenault the prerecorded currency.

22.     CS1 stated that it spoke briefly with Arsenault and Arsenault's live-in girlfriend "Meghan."  CS1 said that it knew Meghan used methamphetamine and believed Meghan was taking advantage of Arsenault by living with him and using him as her methamphetamine source of supply.  CS1 stated that it was aware that Meghan had children and CS1 said it could hear two young boys upstairs in the Success Road Residence during the January 19, 2021 transaction.

23.     I believe "Meghan" to be Meghan Humphries because of conversations with New Hampshire State Trooper Charles Newton, who had gathered the information that Humphries was residing at the Success Road Residence. Trooper Newton was aware of Humphries living arrangements through conversations with a family member of Humphries and through conversations with other law enforcement officers. CS1 provided information that Meghan abused methamphetamine. CS1 said it was common knowledge that Humphries used methamphetamine.  Humphries was charged with Class B Felony in 2019 out of Coos Superior Court for Sale of the Controlled Drug methamphetamine. She was convicted of a Class A Misdemeanor violation of the Controlled Drug Act out of Coos Superior Court in 2019.

<u>February 25, 2021 Controlled Buy</u>

24.     On February 25, 2021, at the direction of DEA, CS1 conducted a controlled purchase of methamphetamine from Arsenault at the Success Road Residence.  CS1 arranged to purchase an "eight ball" of methamphetamine from Arsenault using the Telegram messenger application and by regular cellular text to Arsenault's cellular phone number, identified by CS1 as (603) 723-0619 between February 9, 2021 and February 25, 2021.  I reviewed these messages and confirmed they arranged the purchase of methamphetamine.

25.     CS1 and its vehicle were searched before the controlled transaction. CS1 was then provided $250.00 in recorded currency.  CS1 was also outfitted with audio and video recording equipment.  It should be noted that there was a malfunction with the equipment and as a result the methamphetamine transaction was not recorded. At approximately 4 pm on February 25, 2021, CS1 arrived at the Success Road Residence.  Law enforcement observed him drive into the driveway at the Success Road Residence.

26.     Shortly after 4 pm, law enforcement observed a black 2010 GMC 2500 bearing New Hampshire registration 330C leave the driveway. Law enforcement observed the driver, who fit the physical description of Humphries. The vehicle was subsequently located by law enforcement at the Berlin, New Hampshire United States Post Office. Law enforcement observed Humphries walking toward the truck with a young child, Humphries entered the GMC truck and she drove away from the area.

27.     Approximately 17 minutes after arriving at the Success Road Residence, I observed CS1 driving away from the Success Road Residence.  Law enforcement followed CS1 to a predetermined location where CS1 provided law enforcement with a small zip loc bag.  The bag was clear on one side and had black and green money symbols on the other side. The bag contained a clear crystal substance.  With packaging, the weight of the purchased evidence was 33.06 grams.  Law enforcement tested the contents of the bag with a TruNarc Handheld Narcotics Analyzer, and the contents of the bag provided a presumptive positive result for the presence of methamphetamine. The methamphetamine was sent to the Northeast Regional Laboratory for testing. The substances in the exhibit were identified as methamphetamine hydrochloride and Dimethyl Sulfone, had a net weight of 3.511 grams, and a substance purity level of 64%.

28.     Just as before, CS1 and its vehicle were searched; law enforcement ensured that there was no concealed cash, drugs, drug paraphernalia, or weapons in CS1's person or in the vehicle.

29.     CS1 provided the following information about the February 25, 2021 controlled transaction: CS1 drove to the Success Road Residence and saw Humphries driving a 2500 pick-up truck away from the Success Road Residence.  CS1 entered the Success Road Residence through the front door and saw Arsenault in the kitchen. Arsenault told CS1 that Humphries had driven his truck to the Berlin, New Hampshire Post Office. CS1 subsequently relayed this information to law enforcement. Arsenault said he had driven to Berlin, New Hampshire to acquire methamphetamine for himself and CS1. Arsenault told CS1 there was no "vein" for methamphetamine at the time. Based upon my training and experience, I believed this statement meant there were no consistent methamphetamine sources of supply in the area at the time. Arsenault escorted CS1 to the basement of the Success Road Residence. CS1 observed the bag of methamphetamine on top of a scale in the basement.  Arsenault handed CS1 the suspected drugs and CS1 handed Arsenault the prerecorded currency.

<u>April 7, 2021 Controlled Buy</u>

30.     On April 7, 2021, at the direction of DEA, CS1 conducted a controlled purchase of methamphetamine from Arsenault at the Success Road Residence.  CS1 arranged to purchase a "quattro" of methamphetamine from Arsenault using the Telegram messenger application between April 2, 2021 and April 7, 2021. Based upon my training, experience, and conversations with CS1 I know that the term quattro was a term to describe a quarter ounce of methamphetamine.  Arsenault agreed to sell CS1 a quarter ounce of methamphetamine for

$450.00. I reviewed these messages and confirmed they arranged the purchase of methamphetamine.

31.     CS1 and its vehicle were searched before the controlled transaction. CS1 was then provided $450.00 in recorded currency.  CS1 was also outfitted with audio and video recording equipment.  Shortly before 6 pm on April 7, 2021, CS1 arrived at the Success Road Residence. Law enforcement observed it drive into the driveway at the Success Road Residence.

32.     Approximately 13 minutes after arriving at the Success Road Residence, I observed CS1 driving away from the Success Road Residence.  Law enforcement followed CS1 to a predetermined location where CS1 provided law enforcement with two small zip loc bags. The bags contained a clear crystal substance.  With packaging, the weight of the purchased evidence was 33.27 grams.  Law enforcement tested the contents of the bag with a TruNarc Handheld Narcotics Analyzer, and the contents of the bag provided a presumptive positive result for the presence of methamphetamine. CS1 returned $80.00 of prerecorded currency, which was not used during the controlled purchase.

33.     Just as before, CS1 and its vehicle were searched; law enforcement ensured that there was no concealed cash, drugs, drug paraphernalia, or weapons in CS1's person or in the vehicle.

34.     CS1 provided the following information about the April 7, 2021 controlled transaction: CS1 drove to the Success Road Residence and saw Arsenault outside the residence. Arsenault led CS1 to the exterior basement door and into the basement. Arsenault told CS1 Humphries and her children were not at the residence at the time of the transaction. Arsenault smoked methamphetamine from a pipe during the transaction. Arsenault told CS1 the order was not the full requested amount from Arsenault's source of supply because someone "dropped"

methamphetamine. CS1 assumed dropped meant an amount of methamphetamine was missing or it a low resupply. Arsenault repeatedly referenced "she" when talking about acquiring his resupply of methamphetamine. The CS1 assumed she was a reference Humphries and her involvement in the resupply. Arsenault smoked methamphetamine from a pipe during the transaction.  Arsenault retrieved the two bags of methamphetamine from a clear jar in the basement. Arsenault weighed the two bags on a scale. Arsenault told CS1 to retain $80.00 from the agreed upon price because he could not give CS1 the full quarter ounce of methamphetamine. Arsenault handed CS1 the suspected drugs and CS1 handed Arsenault the prerecorded currency.

35.      It is my belief that Arsenault uses cellular devices to communicate through Telegram. Telegram is accessed through personal electronic devices, typically cellular phones. I have viewed previous Telegram text message conversation between CS1 and Arsenault on CS1's cellular telephone.

<u>April 22, 2021 Telegram Text Message Conversation</u>

36.      On Thursday, April 22, 2021, at approximately 0759 hours, at the direction of law enforcement CS1 contacted Arsenault to arrange a purchase of methamphetamine. The CS communicated with Arsenault by sending texts through the Telegram application.

37.      CS1 inquired about purchasing a "halfie," meaning a half ounce of methamphetamine from Arsenault. Arsenault replied that "a friend came over early this morning" and he could produce the requested amount at the time of the text. They continued to communicate and Arsenault informed CS1 that the half ounce of methamphetamine would cost $600.00. CS1 informed Arsenault that more time was needed to procure the money. Arsenault texted CS1 that he could sell the methamphetamine but had to get the deal done quickly. Investigators reviewed copies of the Telegram text message conversation and confirmed the information.

### Confidential Human Source #2

38.     On January 29, 2021 Trooper Newton, DEA Special Agent Galen Doud, and I

interviewed a New Hampshire Attorney General Drug Task Force ("NHAGDTF") Confidential

Human Source.  CS2 began cooperating with the DEA in 2019 and has cooperated in exchange

for consideration on forthcoming charges.  Information CS2 has provided has proven to be

reliable.  CS2 has provided corroborated intelligence regarding multiple sources of supply,

participated in multiple controlled buys, and provided actionable information, which has resulted

in arrests, and seizures.

39.     CS2 had visited Arsenault and Corey Bernard at the Success Road Residence a

couple months before the interview.  CS2 could not recall the exact date of the visit.  While at

the residence, CS2, Bernard, and Arsenault shot Arsenault's Kel-Tec shotgun outside the

Success Road Residence. CS2 said Bernard was a methamphetamine dealer and it believed he

was living with Arsenault at the Success Road Residence.  CS2 further said Bernard had tried to

arrange methamphetamine transactions with CS2.

### Training and Experience Concerning Items to be Seized

40.     Based upon my training and experience, as well as the collective knowledge and

experience of other agents and police officers in my office, I am aware that drug traffickers very

often store controlled substances, firearms, and other tools of the drug trade in their homes,

automobiles, garages or outbuildings on their properties, basements, or other places under their

immediate control. I am aware that it is generally a common practice for drug traffickers to store

their drug inventory and drug-related paraphernalia including, but not limited to, scales, plastic

baggies, wrapping material, paper or plastic bundles, and zip lock bags, in residences or other

locations they access with frequency. Based on my training and experience, methamphetamine is generally brought into the region in bulk.

41.     It is generally a common practice for drug traffickers to maintain in hard copy or on computers or other electronic devices, records relating to their drug trafficking activities. Because drug traffickers in many instances will "front" (that is, sell on consignment) controlled substances to their clients, or alternatively, will be "fronted" controlled substances from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances.

42.     Drug traffickers will commonly maintain records and documents which provide a paper trail for money laundering of illicit drug trafficking proceeds, often long after the actual transactions. There are many reasons why an individual will generally maintain records for long periods of time. One reason is that the records will often seem innocuous because of their nature (e.g. financial, credit card and banking documents, travel documents, receipts, client lists, documents reflecting purchases of assets, personal calendars, telephone and address directories, check books, videotapes and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone bills, keys to safe deposit boxes, packaging materials, computer hardware and software). Second, the individual may no longer realize he/she still possesses the records or may believe law enforcement could not obtain a search warrant to seize the evidence. Lastly, it is common for individuals to set aside or store such records, and because they generally have no immediate need for the records, they are often forgotten. To law enforcement, however, all these items may have significance and relevance when considered in light of other evidence.

43.     Additionally, drug traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their drug trafficking business. Drug traffickers may also keep lists of customers, the cars they drive, and the phones they use in order to keep track of them. They may also collect court papers and other documents about customers who they believe may be cooperating with law enforcement authorities in order to protect themselves or attempt to intimidate potential cooperators.

44.     It is also a generally common practice for traffickers to conceal at their residences or other places they access frequently large sums of money, either the proceeds from drug sales or monies to be used to purchase controlled substances. Individuals who distribute controlled substances often use cash or readily transported assets which are used as cash equivalents like pre-paid debit cards, gift cards, bearer bonds, gold, diamonds, or jewels because of the illegal nature of the transactions and to lessen the possibility of a financial paper trail. Additionally, drug traffickers typically make use of wire transfers, cashier's checks, and money orders to pay for controlled substances. They may also use banks and wire companies, both foreign or domestic, to launder and transfer funds to co-conspirators. They may also use shipping companies and keep records of shipments of goods bought with drug proceeds. Records relating to income and expenditures of money and wealth in connection with drug trafficking would also typically be maintained in residences. I know that drug traffickers in general have purchased expensive jewelry with suspected drug proceeds. They may keep this jewelry, and records and receipts of those purchases in their residences. They may also keep records of real estate transactions, money received from rental properties, and other such documents in their residences.

14

45.     Based on my training and experience, I know that individuals involved in the distribution of controlled substances often use storage units to store drug proceeds and that keys or records of these units may be kept in residences.

46.     They may also maintain surveillance systems of their residences. Surveillance systems may capture evidence of meetings between distributors and customers and/or coconspirators, shipments of drugs, or other meetings relevant to drug transactions.

47.     Typically, drug traffickers possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might attempt to forcibly take the traffickers' profits and/or supply of drugs.

48.     Based on my training and experience, I know that drug traffickers typically use cellular telephones in order to facilitate drug transactions, including to order and take orders for controlled substances or to set up shipments. I am aware that items such as cell phones and US currency are often located in a residence or on an individual's person. Arsenault arranged controlled transactions via an application on a cellular telephone.

49.     Individuals involved in the illicit distribution of controlled substances often take or cause to be taken photographs of themselves, their associates, their property and their product and such items are usually maintained within their residence and sometimes on cell phones or computers.

50.     It is common for individuals who are involved in the trafficking and distribution of controlled substances to store the records of those activities and proceeds of those activities in secure areas over which they have control such as safes, bags, locked drawers, briefcases, and duffel bags, among other locked containers.

<u>Training and Experience on Digital Devices</u>

51.     In addition to documentary evidence of financial and drug trafficking crimes, drug traffickers commonly possess and use multiple cellular telephones simultaneously to conduct their drug trafficking activities and many of these cellular telephones are kept at drug stash houses or at the dealers' own residences.  It is common for these cellular telephones to be retained, although not necessarily used, for months or longer by drug traffickers in their vehicles, residences, and businesses.  Drug traffickers often do not discard their cellular telephones immediately after they stop actively using them.  Therefore, while it is common for drug traffickers to stop using cellular telephones frequently, it is far less common for drug traffickers to discard their cellular telephones after they switch to new cellular telephones. I am aware that collections of cell phones have been found during drug trafficking search warrants of stash houses or residences that have included cell phones that were no longer being used by a particular drug trafficker but had nevertheless been retained.

52.     As noted above, evidence of drug crimes can be found in the cell phones and smart phones referenced in the preceding paragraphs.  Such evidence can include internet searches for drug-related paraphernalia, addresses, or telephone numbers, as well as incriminating communications via emails, text messages or instant messages.  Actions such as internet searching or emailing (in addition to calling) and text messaging can now be performed from many cell phones. In addition, some members of this drug trafficking organization frequently discussed communicating with each other over social media platforms including some that are encrypted and therefore difficult for law enforcement to intercept. During this investigation, Arsenault communicated with CS1 over Telegram.  I know, based on my training

and experience, that drug traffickers may use these platforms to communicate with people who are most cautious about law enforcement detection.

53.     In addition, those involved in drug trafficking crimes commonly communicate using multiple cellular telephones.  Contemporaneous possession of multiple cellular telephones is, therefore, evidence of drug trafficking.  Moreover, the particular numbers of and the particular numbers dialed by particular cellular telephones can be evidence of drug trafficking, particularly in a case, such as one here, where investigators have analyzed telephone toll records between involving the interception of communications between drug traffickers. Such numbers can confirm identities of particular speakers and the occurrence of certain events.

54.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through e-mail, instant messages, and updates to online social-networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online. I am also aware that the Consumer Electronics Association estimated that in 2010, 86 percent of all U.S. households owned at least one computer. Based on my training and experience, I know that people generally keep computers, tablets, or iPads in their primary residences.

55.     Based on my training, experience, and information provided by other law enforcement officers, I know that many smartphones can now function essentially as small computers. For example, use of the Telegram application indicates that Arsenault's phone is a smartphone because the application is used by smartphones. Smartphones have capabilities that include serving as a wireless telephone, digital camera, portable media player, GPS navigation

device, sending and receiving text messages and e-mails, and storing a vast range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

56.     As with most electronic/digital technology items, communications made from an electronic device, such as a computer or a cell phone, are often saved or stored on the device. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that data in digital form can be stored on a variety of digital devices and that during the search of a premises it is not always possible to search digital devices for digital data for a number of reasons, including the following:

      a. Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment.  There are so many types of digital devices and software programs in use today that it is impossible to bring to the search site all of the necessary technical manuals and specialized equipment necessary to conduct a thorough search.  In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched.

      b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  As a result, a controlled environment, such as a law enforcement laboratory or similar

facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

c.   The volume of data stored on many digital devices will typically be so large that it will be highly impractical to search for data during the physical search of the premises.  A single megabyte of storage space is the equivalent of 500 double-spaced pages of text.  A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.  Storage devices capable of storing 500 or more gigabytes are now commonplace.  Consequently, just one device might contain the equivalent of 250 million pages of data, which, if printed out, would completely fill three 35' x 35' x 10' rooms to the ceiling.  Further, a 500 gigabyte drive could contain as many as approximately 450 full run movies or 450,000 songs.

d.   Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet.  Electronic files saved to a hard drive can be stored for years with little or no cost.  Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools.  Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten.  In addition, a computer's

operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

e. Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). This data can be evidence of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

f.   Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data on a digital device is not segregable from the digital device.  Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

g.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of any seized devices consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

<u>Conclusion</u>

57.     For all the reasons described above, I submit that there is probable cause to believe that evidence and fruits of the violations of Title 21, United States Code, Sections 841(a)(1) and 846 will be found by searching the location described in Attachments A. Based upon my training and experience I believe that the items set forth in Attachments B are commonly possessed by drug traffickers in their homes, on their cell phones, or in other places under their control and that those items are evidence of violations of the offenses being committed by Arsenault and others.


/S/ Clifford Ellston
TFO Clifford Ellston
DEA


The affiant appeared before me by telephonic conference on this date pursuant to Fed. R. Crim. P. 4.1 and affirmed under oath the content of this affidavit and application.

Date: **Apr 26, 2021**
Time: **3:02 PM, Apr 26, 2021**

Honorable Andrea K. Johnstone
United States Magistrate Judge

22

**ATTACHMENT A**

**278 Success Road, Milan, New Hampshire**

This search warrant authorizes the search of the premises described as 278 Success Road, Milan, New Hampshire, including all safes, containers, and enclosures therein. The residence located at 278 Success Road, Milan, New Hampshire is a Cape Cod style single family home with a wooden exterior, which was built in 2011.

As described in Attachment B, this warrant authorizes the search of electronic devices seized from the residence located at 278 Success Road, Milan, New Hampshire in accordance with Attachment B.

# ATTACHMENT B

1.      Controlled substances including, but not limited to methamphetamine;

2.      Drug distribution paraphernalia including, but not limited to: scales, plastic baggies, wrapping material, paper or plastic bundles, blenders, zip lock bags, presses, cutting agents, and pill presses;

3.      Devices used to communicate with other drug traffickers or buyers including cellular telephones and pagers; electronic equipment used for counter-surveillance such as scanners, police radios or monitors, surveillance cameras and monitors and devices used to store surveillance footage, anti-bugging devices and devices used to detect the presence of wiretaps, recording devices or transmitters, and/or receipts or literature describing same;

4.      Documents associated with drug trafficking including pay-owe sheets, buyer lists, seller lists, ledgers, records of sales, records of expenditures made to purchase drugs or chemicals and apparatus used to manufacture drugs, buyer lists, telephone lists, address books (written or electronic / digital media) and iPads, electronic devices, personal computers and all objects capable of storing financial digital data in any form used or believed to be used by Arsenault or co-conspirators;

5.      Large amounts of currency (exceeding $250) or readily transported assets which are used as cash equivalents (cashiers' checks, bearer bonds, gold, diamonds, precious jewels, etc.); prepaid debit cards and gift cards;

6.      Materials evidencing the receipt of large amounts of cash including bank statements and related records, passbooks, letters of credit, money drafts, cashier's checks, bank checks, checkbooks, tax returns, loan statements, tax return work papers, escrow files, Forms 1099, wire transfer records, and other items evidencing the obtaining, secreting, transfer, concealment, and expenditure of money related to drug trafficking activities;

7.      Bank and other financial institution records, showing acquisition, conversion, movement, secreting, transfer and disbursement of United States and foreign currency from 2019 to the present;

8.      Materials evidencing expenditure of drug trafficking proceeds including, purchase of large assets, including digital image storage devices, records of real estate or securities transactions, escrow files, wire transfer records, jewelry, automobiles, motorcycles, trucks, or other vehicles purchased with cash or cash equivalents; credit and debit card records, including records of purchases, withdrawals, deposits and cash advances made with credit and debit cards, and including statements and receipts;

9.      Photographs, negatives, video tapes, films, depicting the subjects of the investigation and their criminal associates, (showing association with the associates, depicting their assets or depicting controlled dangerous substances);

10. Personal calendars, address and/or telephone books, rolodex indices and papers reflecting names, addresses, telephone numbers, pager numbers, fax numbers and/or telex numbers, correspondences of the subjects of the investigation and their criminal associates, sources of supply, customers, financial institutions, and other individuals or businesses with whom a financial relationship exists;

11. Weapons to include handguns, ammunition, rifles, shotguns, hand crafted guns, explosive devices, etc., in which there is no immediate appearance of legitimate use and of which may be used in conjunction with the distribution of controlled substances;

12. Indicia of possession of the place to be searched: including articles of personal property, such as personal identification, immigration documents, personal correspondence, delivery pouches, diaries, checkbooks, notes, photographs, keys, utility bills, receipts, personal telephone and address books, and video tapes, tending to establish the identity of the person or persons in control of the areas to be searched;

14. Keys to show ownership for storage facilities, businesses, locked containers, cabinets, safes, safe deposit boxes, conveyances and/or other residences.

15. I seek to search any cellular telephones seized pursuant to the warrant for:

    a. Information associated with drug trafficking, including pay-owe sheets, buyer lists, telephone lists, address books, seller lists, ledgers, records of sales, records of expenditures made to purchase controlled substances, and records of expenditures to purchase products which are used in the distribution of controlled substances;

    b. lists of customers and related identifying information;

    c. types, amounts, and prices of controlled substances trafficked as well as dates, places, and amounts of specific transactions;

    d. any information related to sources of controlled substances (including names, addresses, phone numbers, or any other identifying information);

    e. any information involving the travel to obtain controlled substances or the transportation of controlled substances;

    f. information reflecting contact or communication with coconspirators, the distribution of controlled substances to coconspirators, and the disposition of proceeds of controlled substances (including within messaging applications like WhatsApp, Snapchat, Telegram, and Instagram stored on the phone);

    g. all bank records, checks, credit card bills, account information, and other financial records; and

h.  Evidence of user attribution showing who used or owned the devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

I seek authority to seize other telephones in the residence that are believed to be used by these targets or co-conspirators but will seek further authority before conducting searches of those devices. Investigators will not seize cellular telephones determined to belong to third parties who may be present in these residences but who are not co-conspirators. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.